IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR No.: 0:04-898-JFA |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| CURTIS KABRAY ASHFORD | ) | |
| | ) | |

This matter is before the court on the defendant's *pro se* motion for a reduction in his sentence pursuant to the First Step Act of 2018 and 18 U.S.C. § 3582(c)(1)(A) (ECF No. 571). Seeking compassionate release, the defendant states that he has serious medical conditions which render him particularly vulnerable if he is infected with the COVID-19 virus.

The government has responded in opposition, arguing that the defendant has not shown an extraordinary and compelling reason for release. Additionally, the government asserts that the statutory sentencing factors under 18 U.S.C. § 3553(a) do not weigh in favor of the defendant's release.

The court has carefully considered the record before it and conducted an individualized analysis of the facts and issues raised by the parties. For the reasons which follow, the defendant's motion is respectfully denied.

PROCEDURAL HISTORY

The defendant pleaded guilty to two counts of the Third Superseding Indictment in this case. Count 1 charged him with conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of cocaine, 50 grams or more of cocaine base, and a quantity

1

of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), and 841 (b)(1)(D). Count 7 charged him with using and carrying a firearm during a federal drug trafficking crime and causing the death of Robin Platts through the use of firearms, in violation of 18 U.S.C. § 924(j)(1) and (2).

The Presentence Report (PSR) (ECF No. 278) prepared by the United States Probation Office determined that the defendant's base offense level was 38. It was increased 2 levels because a firearm was used. The offense level then increased 3 more levels as a result of the cross-reference to murder of U.S.S.G. § 2D1.1. He then received a 3-level reduction for acceptance of responsibility, resulting in a total offense level of 40. With a criminal history category of II, the Guideline range for imprisonment was 324 to 405 months. The 2005 edition of the U.S. Sentencing Guidelines Manual was used.

In December 2006, this court sentenced the defendant to a custodial term of 220 months, consisting of 220 months as to Count 1, and 220 months as to Count 7, those terms to run concurrently. The term of supervised release was set at 5 years. This sentence included a 4-level departure from the otherwise applicable Guideline range based upon the defendant's substantial assistance pursuant to U.S. Sentencing Guideline (USSG) § 5K1.1.

The defendant did not appeal his conviction or sentence.

STANDARD OF REVIEW

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *See United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson*, 952 F.3d 492 (4th Cir. 2020); *United States v. Martin*, 916

F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *See Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. It was originally adopted as part of the Sentencing Reform Act of 1984.

On December 21, 2018, the First Step Act was signed into law. Broadly, the Act's goals were to reform federal prisons and sentencing laws to reduce recidivism, decrease the federal inmate population, and maintain public safety. The First Step Act also expanded the existing compassionate release provisions of federal law by allowing an inmate to move for compassionate release himself, rather than allowing only the Director of the Bureau of Prisons (BOP) to do so. The relevant portion of the First Step Act, codified at 18 U.S.C. § 3582(c)(1)(A), as amended by § 603(b) of the First Step Act, provides:

> [T]he court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) [of Title 18] to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A).

By its terms, § 3582(c)(1)(A) permits the court to reduce the defendant's term of imprisonment after considering the factors set forth in 18 U.S.C. § 3553(a) if the court first finds that (i) extraordinary and compelling reasons warrant such a reduction; and (ii) such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. In addition, a district court may not grant a sentence reduction under § 3582(c)(1)(A) without considering the § 3553 factors to the extent they are applicable. *United States v. Kibble*, 992 F.3d 326, 332 (4th Cir. 2021).

In *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020), the Fourth Circuit agreed with the Second Circuit in *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020) and found that there is, as of now, no "applicable policy statement governing compassionate release motions filed by defendants under the recently amended § 3582(c)(1)(A)," and as a result, district courts are "empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise." *McCoy*, 981 F.3d at 284 (citing *Brooker*, 976 F.3d at 230); *see also, Kibble*, 992 F.3d at 331.

A defendant's rehabilitation standing alone does not provide sufficient grounds to warrant a sentence modification. 28 U.S.C. § 994(t). Also, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court generally proceeds in three steps. *See United States v. High*, 997 F.3d 181, 185–86 (4th Cir. 2021). First, the court determines whether "extraordinary and compelling

4

reasons" support a sentence reduction. Next, the court considers whether a sentence reduction is consistent with applicable policy statements issued by the Sentencing Commission. As noted previously in this order and as set out in *McCoy*, because there is no applicable policy statement governing compassionate release motions filed by defendants under the recently amended § 3582(c)(1)(A), district courts are empowered to consider any extraordinary and compelling reason for release that a defendant might raise. Finally, if the court finds that extraordinary and compelling reasons warrant relief, the court must consider the § 3553(a) factors in deciding whether to exercise its discretion to reduce the defendant's term of imprisonment.

Even if the defendant meets the eligibility criteria for compassionate release, this court retains discretion as to whether to grant relief. *See* 18 U.S.C. § 3582(c)(1)(A) (providing the court may reduce the term of imprisonment) (emphasis added).

*Exhaustion of Administrative Remedies*

Before a court may consider a defendant's motion for compassionate release, the defendant must have completed the initial step of requesting that the BOP bring a motion on their behalf. The defendant may file a motion with the court after (1) fully exhausting all administrative rights to appeal; or (2) after the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A). *See United States v. Muhammad*, __ F.4th __, 2021 WL 4888393, at *3 (4th Cir. Oct. 20, 2021).

It appears to this court that the defendant has fully exhausted his administrative remedies, the court will proceed to review the matter on the merits.

## DISCUSSION

The mere existence of the COVID-19 pandemic—which poses a threat to every non-immune individual in the world—cannot independently provide a basis for a sentence reduction or justify compassionate release. However, COVID-19 is certainly relevant to the court's analysis of a § 3582(c)(1)(A) motion for compassionate release. If a defendant has a chronic medical condition that has been identified by the Centers for Disease Control (CDC) as elevating the inmate's risk of becoming seriously ill from COVID-19, it is possible that such medical condition could satisfy the extraordinary and compelling reasons standard. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

Rather, the threshold questions are whether the defendant has a particularized risk of contracting COVID-19 in prison and whether his medical conditions render him particularly susceptible to severe illness or death should he contract the virus. *See United States v. Youngblood*, No. 20-7836, 2021 WL 4167105, at *2 (4th Cir. Sept. 14, 2021) (citing *United States v. High*, 997 F.3d 181, 185 (4th Cir. 2021)).

### *The Defendant's Motion for Compassionate Release*

In his motion (ECF No. 571), the defendant asserts that he is on medication for Type II diabetes, and that he has breathing issues, heart attack/stroke issues, and is obese. All of

these conditions place him in a higher risk category for illness from COVID-19 as listed by the Centers for Disease Control (CDC).

The government has retrieved the defendant's medical records from the BOP, and correctly points out that these records list the defendant as having Type II diabetes, sleep apnea, and obesity. These records apparently do not reference heart problems. The defendant's 2006 PSR indicates that at that time, the defendant suffered from chronic bronchitis and asthma. The PSR also indicated that the defendant had not "experienced any problems with these medical conditions recently."

In a supplemental brief, the government indicates that the defendant has received two doses of the Pfizer vaccine and is now fully vaccinated as of September 13, 2021.

Putting aside the defendant's disputed heart problems, the fact remains that he has been diagnosed with Type II diabetes and obesity, having a Body Mass Index (BMI) of 47. These two medical conditions fall within the current CDC guidelines as making a person more susceptible to severe illness from COVID. Accordingly, for purposes of the motion before the court, the court will assume that the defendant has, in fact, demonstrated an extraordinary and compelling reason, that is, his current medical conditions, for compassionate release.

However, the court's inquiry does not end here. Under Fourth Circuit guidance, this court must now make an individualized assessment of the defendant's case, with specific attention to the factors under 18 U.S.C. § 3553(a), and also with particular review of the defendant's post-sentencing conduct while incarcerated.

7

Taking the § 3553(a) factors in order, the court finds as follows:

1.  *Nature and Circumstances of the Offense*.  This court views the defendant's instant crimes as most serious in nature.  He actually stipulated that he distributed at least 1.5 kilograms of crack cocaine.  Crack cocaine is a powerfully addictive stimulant that is a severe and pervasive problem in South Carolina.

Even more significantly, in May 2004, the defendant and his co-defendants, LaTonya Renee Davis, Horace Vaughn, Jr., and another individual, traveled from North Carolina to the Midlands area of South Carolina to meet a co-conspirator (Anthony White) to exchange a kilogram of cocaine.  White had his girlfriend and mother of his children, Robin Platts, driving him from Charleston to Columbia to meet Davis and her co-conspirators, including the defendant Ashford.  White was unaware of Davis and Ashford's plan to rob him of the cocaine and money he would be carrying.  The defendant and his co-defendants devised a plan to lure White to an exit off of Interstate 26 in South Carolina and rob him of both the cocaine and money.  As Platts and White took the Little Mountain exit off I-26, two shooters opened fire on Platts' vehicle.  Platts was shot in the head and later died.  Subsequent to the shooting and during the investigation, law enforcement officers found $34,000 cash and 1 kilogram of cocaine powder in a wooded area near the I-26 exit.  Telephone records thereafter led FBI agents to the discovery of the drug conspiracy.

Law enforcement officers located Ashford's co-defendant, Roy Sargeant, in Rock Hill, South Carolina, and arrested him on drug and firearm charges. Authorities then learned that Ashford, Sargeant's nephew, was also involved in the drug conspiracy by selling drugs

8

he received from Sargeant. After his arrest, Sargeant began cooperating and provided information that he and Ashford were both armed with firearms during the May 14, 2004 robbery trip in South Carolina, and that they both shot at the car driven by Platts and occupied by White. Co-defendant Michael Crank also admitted to being present when Ashford and Sargeant testified about "unloading" into a car driven by a female. Ultimately, all co-defendants entered guilty pleas and cooperated against their co-defendant— the ringleader and drug supplier—LaTonya Renee Davis, who proceeded to trial and was convicted by a jury. The defendant's testimony against Davis led to this court's 4-level downward departure at sentencing.

In his Plea Agreement (ECF No. 159), the defendant stipulated to the following: the threshold amount of drugs attributable to him in Count 1 was 50 grams or more of cocaine base (or crack), 5 kilograms or more of cocaine, and a quantity of marijuana. He further stipulated that a 2-level enhancement for possession of a firearm was applicable under USSG § 2D1.1(b), and that the murder cross-reference under USSG § 2D1.1(d) was applicable. The parties agreed that the defendant's base offense level was 43, and that he should receive a 3-level reduction for acceptance of responsibility. Also, the government agreed to recommend to the local Solicitor that the defendant not be prosecuted for any related state crimes.

It can thus readily be seen that the defendant pleaded guilty to a most serious series of events. Not only was he responsible for conspiring to and actually distributing large amounts of a powerfully addictive substance, he participated in the pre-meditated and cold-blooded murder of a fellow human being who was in the unfortunate situation of being

9

merely a driver for a rival drug dealer.

2. *History and Characteristics of the Defendant.* The defendant was part of a union of two individuals living in Charlotte who were not married. He had virtually no contact with his father after birth. The defendant was raised by his maternal grandmother. He is single with no marital history, and has a child who resides with her mother. He experienced disciplinary problems while in school and has had some mental health and counseling issues which are detailed in the PSR, but not available on the public record pursuant to 21 U.S.C. § 1175 CFR § 2.39. The court is aware of these factors listed in the PSR.

The defendant's criminal history includes convictions for shoplifting, second degree trespassing, driving without a license, and assault on a female. Significantly, the defendant was on state probation at the time of the instant federal offenses.

*Post-Sentencing Conduct*

Regarding the defendant's personal characteristics, his disciplinary violations while incarcerated are lamentable, to wit:

- February 21, 2020: possessing a dangerous weapon (code 104);

- December 12, 2019: possessing a non-hazardous tool (code 331) and possessing drugs/alcohol (code 113);

- November 21, 2019: possessing unauthorized item (code 305);

- February 10, 2019: possessing unauthorized item (code 305) and possessing a non-hazardous tool (code 331);

- June 19, 2018: possessing drugs/alcohol (code 113);

- July 3, 2016: assaulting without serious injury (code 224) and possessing a non-hazardous tool (code 331);

- June 3, 2016: phone abuse-disrupt monitoring (code 297);

- March 16, 2016: being absent from assignment (code 310);

- October 17, 2015: stealing (code 219A);

- October 16, 2015: possessing unauthorized item (code 305);

- March 25, 2015: destroy property $100 or less (code 329);

- March 23, 2015: destroy property $100 or less (code 329);

- April 14, 2014: failing to stand count (code 320);

- April 6, 2014: fighting with another person (code 201);

- November 14, 2013: refusing to obey an order (code 307) and being insolent to staff member (code 312);

- September 26, 2013: being insolent to staff member (code 312);

- September 23, 2013: being in unauthorized area (code 316);

- June 10, 2013: being insolent to staff member (code 312);

- May 6, 2013: interfering with taking count (code 321);

- January 21, 2011: possessing a dangerous weapon (code 104)(claims he was in food service when the weapon was found. 6 inch metal rod with point found in bunk);

- January 2, 2011: refusing to obey an order (code 307) and being insolent to staff member (code 312);

- November 9, 2010: refusing to obey an order (code 307);

- November 17, 2010: possessing unauthorized item (code 305);
- June 27, 2010: fighting with another person (code 201);

- September 29, 2009: fighting with another person (code 201);

11

- August 6, 2009: being insolent to staff member (code 312);

- December 28, 2008: failing to follow safety regs (code 317);

- July 24, 2007: possessing a dangerous weapon (code 104A); and

- June 2, 2007: possessing intoxicants (code 222).

According to the BOP, 100-level offenses are the most serious; 200-level offenses are moderately serious; and 300-level offenses are the least serious.

The BOP has indicated that the defendant earned his GED while incarcerated and that he has taken the following educational/vocational credits:

- Carpentry I and II
- Spanish Grammar
- AIDS awareness I & II
- Intermediate Spinning
- RPP Health/Nutrition
- Peaceful Solutions
- Career Planning

The defendant is 38 years old. He has served 178 months of his 220-month sentence and is scheduled for release on September 29, 2022. He is housed at USP Coleman I.

The defendant has suggested that he will be able to "shelter in place" upon his release and that he has "employment lined up" (although the defendant fails to provide any details of this). The court is aware of these mitigating factors raised by the defendant, but finds them to lack persuasive force in light of the § 3553(a) factors discussed herein.

3.  *Seriousness of the Crimes.*  As noted herein, the court regards the defendant's crimes as very serious and are fully supportive of a significant sentence.

4. *Whether the Sentence Promotes Respect for the Law and Just Punishment for the Offense*. The court finds a significant sentence is necessary to promote respect for the law and just punishment.

5. *Whether the Sentence Affords Adequate Deterrence to Criminal Conduct*. The court finds that a significant sentence is necessary to provide both general and specific deterrents.

6. *Whether the Sentence Protects the Public from Future Crimes of the Defendant*. The court finds that a significant sentence is necessary to protect the public from future crimes of the defendant. The court views this as an important factor to be addressed in considering the present motion. This is perhaps one of the most important factors counseling against the defendant's immediate release. Not only was he a large scale drug dealer, he participated in a calculated murder of a fellow human being that involved a long drive from Charlotte to Columbia, South Carolina.

7. *Need to Avoid Unwarranted Disparity*. Viewing the defendant's sentence as compared with the culpability of the defendant and his associates, his imposed sentence was and is in line with the other co-defendants. The sentences received by the defendant's co-defendants were as follows:

| | |
|---|---|
| Roy Patrick Sargeant | 275 months |
| LaTonya Renee Davis | Life, reduced to 360 months by Order (ECF No. 589) |
| Michael Angelo Crank | 144 months |
| Horace Vaughn, Jr. | 144 months |

13

CONCLUSION

For the foregoing reasons, the court determines that, even assuming the defendant has demonstrated an extraordinary and compelling reason for his release due to his medical conditions, his release at this time is not appropriate in light of this court's individualized assessment of the § 3553(a) factors, including the defendant's post-sentencing conduct. The motion is respectfully denied.[1] (ECF No. 571).

IT IS SO ORDERED.

December 16, 2021  
Columbia, South Carolina

*Joseph F. Anderson, Jr.*  
Joseph F. Anderson, Jr.  
United States District Judge

---

[1] To the extent that the defendant seeks to have this court direct the BOP to place the defendant in home confinement, this court is without authority to do so. The discretion to release a prisoner to home confinement lies solely with the Attorney General. See 18 U.S.C. § 3624(c)(2); 34 U.S.C. § 60541(g). The legislation recently passed by Congress to address the COVID-19 pandemic does not alter this. See CARES Act, Pub. L. No. 116-136, 134 Stat 281, 516 (2020) ("During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau [of Prisons], the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate.")